**PUBLISHED**

## *VIRGINIA:*

*In the Court of Appeals of Virginia on* **Tuesday** *the* **27th** *day of* **February, 2024**.

Terence Jerome Richardson, s/k/a
  Terrence Jerome Richardson,                                       Petitioner,

 against             Record No. 0361-21-2

Commonwealth of Virginia,                                  Respondent.

Upon a Petition for a Writ of Actual Innocence

Upon remand from the Supreme Court of Virginia, and in accordance with the mandate of that Court entered on February 21, 2024 and the order of that Court entered on February 1, 2024, the order previously entered by this Court on June 21, 2022 is withdrawn and vacated as to this Court's decision to dismiss this matter without an evidentiary hearing, but not as to this Court's ruling to allow the Commonwealth to file a brief that contradicted its initial brief, and this matter is reinstated on the docket of this Court for further proceedings.

Terence Jerome Richardson, s/k/a Terrence Jerome Richardson, previously filed with this Court a Petition for a Writ of Actual Innocence Based on Nonbiological Evidence under Code §§ 19.2-327.10 through 19.2-327.14. Richardson claims that he is actually innocent of involuntary manslaughter, for which he was convicted upon a guilty plea and sentenced in the Circuit Court of Sussex County by final order entered on March 8, 2000. The Commonwealth, represented by the Office of the Attorney General, has filed a response to the petition, along with a supplemental brief and supplemental exhibits. Richardson's counsel has filed a reply to the Commonwealth's supplemental response, along with supplemental exhibits.

The Supreme Court of Virginia has directed that this case requires further development of the facts. Therefore, pursuant to Code § 19.2-327.12, we remand this matter to the Circuit Court of Sussex County for the purpose of taking testimony under oath and subject to both cross-examination and the Rules of Evidence.

The Circuit Court shall provide this Court with a transcript of the testimony of the proceedings and certify findings of fact on the following questions:

### QUESTIONS RELATED TO EYEWITNESS SHANNEQUIA GAY

1. Whether Shannequia Gay affirmatively states, under oath, that she saw the perpetrator flee the area where Officer Allen Gibson was shot on April 25, 1998.

2. Whether Shannequia Gay affirmatively states, under oath, that she made a statement to the police that she saw a "man with dreads" wearing a white t-shirt running away from the area where Officer Allen Gibson was shot on April 25, 1998. If so, did she identify that individual as the perpetrator to the police?

3. Whether Shannequia Gay affirmatively states, under oath, that she was initially shown a single photograph by Detective Gregory Russell on April 25, 1998. If so, did she identify the individual in that photograph to the police as the perpetrator who killed Officer Allen Gibson?

4. Whether Shannequia Gay affirmatively states, under oath, that she was then shown an array of photographs by Investigator Tommy J. Cheek on April 25, 1998. If so, did she identify an individual from that photograph array to the police as the perpetrator who killed Officer Allen Gibson?

5. Whether Shannequia Gay affirmatively states, under oath, that she identified the "man with dreads" wearing a white t-shirt to the police as the perpetrator when she was shown photographs by the police on April 25, 1998. If so, who did she identify as the "man with dreads" wearing a white t-shirt?

6. What actions, if any, did the Commonwealth's Attorney, J. David Chappell, take with regard to Shannequia Gay after the subpoena was issued for her to testify before the Circuit Court?

7. Whether J. David Chappell affirmatively states, under oath, that he provided Richardson's trial counsel, David E. Boone, with information about Shannequia Gay before Richardson's conviction.

8. What actions, if any, did David E. Boone take to locate and speak with Shannequia Gay after the subpoena was issued for her to testify before the Circuit Court?

9. What actions, if any, did Jack Davis, the private investigator hired by David E. Boone, take to locate and speak with Shannequia Gay after the subpoena was issued for her to testify before the Circuit Court?

10. What actions, if any, did the Virginia State Police take regarding the eyewitness Shannequia Gay after the subpoena was issued for her to testify before the Circuit Court?

11. The identities of any other witnesses and the information the Circuit Court receives from them that is relevant to address the above Questions 1 through 10.

12. Any other enumerated findings of fact specifically related to the above Questions 1 through 11.

13. Whether reasonable diligence was exercised by Richardson to discover or obtain the testimony and evidence elicited from the above Questions 1 through 12.

QUESTIONS RELATED TO THE PHOTOGRAPHS AND
THE IDENTIFICATION OF THE PERPETRATOR

14. Whether Detective Gregory Russell affirmatively states, under oath, that he initially showed a single photograph to Shannequia Gay on April 25, 1998. If so, who was the individual in the photograph, and did he provide that information to Shannequia Gay? Did the individual in the photograph have dreads? What did Detective Gregory Russell do with the photograph after speaking with Shannequia Gay?

15. Whether Investigator Tommy J. Cheek affirmatively states, under oath, that he showed an array of photographs to Shannequia Gay on April 25, 1998. If so, who were the individuals in the array of photographs, and who did Shannequia Gay identify, if anyone? What did Investigator Tommy J. Cheek do with the array of photographs after speaking with Shannequia Gay?

16. Whether Deputy Valerie Patterson Ricks affirmatively states, under oath, that she showed any photographs to Shannequia Gay on April 25, 1998. If so, who were the individuals in the photographs, and who did Shannequia Gay identify, if anyone? What did Deputy Valerie Patterson Ricks do with the photographs after speaking with Shannequia Gay?

17. Whether the Virginia State Police confirmed the identity of any person that Shannequia Gay may have identified in a photograph presented to her on April 25, 1998. If so, who did the police state that individual was?

18. Whether, at the time of this crime, all information known to the Commonwealth Attorney's Office would have been offered to defense counsel as part of an "open file" policy or whether some information would have been withheld according to that policy.

19. Whether Shawn Wooden affirmatively states, under oath, that, on April 25, 1998, at Wooden's residence, Richardson stated to him that it was a "new cop" who had just been shot that day. Did Shawn Wooden observe Richardson with dreads at that time? Did Wooden provide this information to the police or testify about this information at any time? Did Wooden ever change his story concerning this information?

20. Whether Shawn Wooden affirmatively states, under oath, that, on April 25, 1998, at his residence, Richardson admitted to shooting Officer Allen Gibson earlier that day and then threatened to harm Shawn Wooden or his family if they ever told anyone that Richardson admitted to shooting Officer Gibson. Did Wooden provide this information to the police or testify about this information at any prior time? Did Wooden ever change his story concerning this information?

21. Whether Shawn Wooden affirmatively states, under oath, that he told the police that Richardson shot Officer Gibson. Did Wooden identify any other individuals besides Richardson to the police as having shot Officer Gibson? Did Wooden tell the police that Richardson or any of those other individuals had dreads? Did Wooden ever change his story concerning this information?

22. The identities of any other witnesses and the information the Circuit Court receives from them that is relevant to address the above Questions 14 through 21.

23. Any other enumerated findings of fact specifically related to the above Questions 14 through 22.

24. Whether reasonable diligence was exercised by Richardson to discover or obtain the testimony and evidence elicited from the above Questions 14 through 23.

## QUESTIONS RELATED TO THE 911 CALL

25. Whether the Virginia State Police have a recording of the 911 call from April 30, 1998, as described in the document from the Sussex County Sheriff's Office included as an exhibit to the petition. What, if anything, did the police do with the recording?

26. Whether the Virginia State Police have information concerning the origin of the 911 call from April 30, 1998, as described in the document from the Sussex County Sheriff's Office included as an exhibit to the petition.

27. Whether the Virginia State Police have information concerning the identity of the caller from the 911 call from April 30, 1998, as described in the document from the Sussex County Sheriff's Office included as an exhibit to the petition.

28. Whether the Virginia State Police have information concerning the foundation of the caller's knowledge from the 911 call from April 30, 1998, as described in the document from the Sussex County Sheriff's Office included as an exhibit to the petition.

29. Whether the Virginia State Police have information concerning the identity of the individual who received and transcribed the 911 call from April 30, 1998, as described in the document from the Sussex County Sheriff's Office included as an exhibit to the petition.

30. Whether Leonard Newby was ever investigated as a potential suspect and what steps, if any, did the investigating officers take to exclude him.

31. Whether David E. Boone requested information from the police related to the 911 call from April 30, 1998. If so, did the police provide that information?

32. Whether J. David Chappell requested information from the police related to the 911 call from April 30, 1998. If so, did the police provide that information?

33. The identities of any other witnesses and the information the Circuit Court receives from them that is relevant to address the above Questions 25 through 32.

34. Any other enumerated findings of fact specifically related to the above Questions 25 through 33.

35. Whether reasonable diligence was exercised by Richardson to discover or obtain the testimony and evidence elicited from the above Questions 25 through 34.

In addition, for each witness who appears before it, the Circuit Court shall provide such factual findings regarding the apparent sincerity, conscientiousness, intelligence, and demeanor of the witness that it

- 4 -

finds relevant to assessing the truthfulness of his or her testimony. *See Dennis v. Commonwealth*, 297 Va. 104, 126 (2019) (noting that trial judges are "better equipped to evaluate the truth of facts" because they are able "to observe witnesses' demeanor and hear their testimony"). Finally, the Circuit Court, as noted *supra*, is directed to determine whether, in the exercise of diligence, the testimony and evidence could have been discovered or obtained before the time the conviction became final in the Circuit Court. Code § 19.2-327.11(A)(vi).

Pursuant to Code § 19.2-327.12, such hearing shall be held within ninety (90) days of the date of this order, and the record and certified findings of fact from the Circuit Court of Sussex County shall be filed in the Court of Appeals within thirty (30) days of the hearing's conclusion. We direct the Clerk of this Court to deliver on this date this order to the Circuit Court of Sussex County and send copies of this order to the Attorney General, the Commonwealth's Attorney for Sussex County, and Richardson's counsel.

This order shall be published.

A Copy,

Teste:

A. John Vollino, Clerk

By: *original order signed by a deputy clerk of the Court of Appeals of Virginia at the direction of the Court*

Deputy Clerk

- 5 -

PUBLISHED

# VIRGINIA:

*In the Court of Appeals of Virginia on* **Tuesday** *the* **21st** *day of* **June, 2022**.

Terence Jerome Richardson, s/k/a
   Terrence Jerome Richardson,                                                                                    Petitioner,

 against                    Record No. 0361-21-2

Commonwealth of Virginia,                                                                                    Respondent.


Upon a Petition for a Writ of Actual Innocence

Before Judges Beales, O'Brien, and Fulton


Terence Jerome Richardson filed with this Court a Petition for a Writ of Actual Innocence Based on Nonbiological Evidence pursuant to the provisions of Chapter 19.3 of Title 19.2 of the Code of Virginia. He contends that he is actually innocent of involuntary manslaughter, of which he was convicted upon a guilty plea in the Circuit Court of Sussex County on March 8, 2000.

## BACKGROUND

On April 25, 1998, Waverly Police Officer Allen Gibson, Jr. was shot in the abdomen with his service weapon. Virginia State Police Trooper T. Jarrid Williams testified at a preliminary hearing in the Sussex County General District Court that he received an alert on the morning of April 25 informing him that a police officer had been shot near the Waverly Village Apartments. When Trooper Williams arrived, he found a large crowd of people gathering outside the apartment complex, including Waverly Chief of Police Warren Sturrup. Chief Sturrup told Trooper Williams that Officer Gibson had been shot and that Officer Gibson was "behind the apartments in the woods."

Trooper Williams "ran back to the woods behind the apartments," where he found Officer Gibson lying on the ground with Corporal Rick Aldridge of the Sussex County Sheriff's Office kneeling near his head. Officer Gibson was conscious and speaking to Corporal Aldridge. Trooper Williams began trying to

talk to Officer Gibson and asked Officer Gibson who had shot him.[1]  Williams testified at the preliminary hearing:

> I asked him, I said Allen, who did this to you? He stated that there were two black males.  One sort of medium build with short, balding hair.  Real short, narrow.  He described one as tall and skinny.  He described one of them with hair that would resemble dreadlocks pulled back into a pony tail.  He said they were both wearing dark jeans.  One of them had on a white T-shirt.  One of them had on an old blue baseball cap.  He said that he had got in a scuffle with them and one of them got his gun.  He referred to the one that had the gun as the skinny one.  He said that he was fighting with him and he was – he was trying to move his hands and show me.  He said I tried to move the gun away from me and he said they shot me with my own gun.

Officer Gibson's condition deteriorated quickly, which prompted Trooper Williams to call for a helicopter evacuation.  In the meantime, a rescue squad ambulance arrived and the paramedics began treating Officer Gibson.  Trooper Williams rode in the ambulance with Officer Gibson to the Waverly Police Department, where Officer Gibson would be transferred to the helicopter.  According to Trooper Williams, Officer Gibson repeated the description of the perpetrators several times in the ambulance.  Just as the helicopter landed, Officer Gibson went into cardiac arrest.  The paramedics were able to resuscitate him, but he then remained unconscious.  Officer Gibson was transferred to a hospital in Petersburg, where he died from his injuries.  He was twenty-five years old.

Shawn Wooden also testified at the preliminary hearing.  Wooden testified that petitioner Terence Richardson was at Wooden's residence on the day of the shooting.  Wooden testified that he and Richardson met Ferrone Claiborne in Waverly earlier that day, intending to go to Petersburg to buy drugs.[2]  Wooden testified that Richardson was wearing blue jeans, a white t-shirt with a marijuana leaf on it, and a plaid shirt

---

[1] Trooper Williams testified that he did not see Officer Gibson's weapon.  However, Corporal Aldridge told him that Chief Sturrup had picked up the gun shortly after arriving at the scene.  Chief Sturrup later acknowledged that he improperly picked up Officer Gibson's weapon before it could be examined for any evidence such as fingerprints or DNA evidence.

[2] Claiborne was Richardson's co-defendant at the preliminary hearing and ultimately pled guilty to being an accessory after the fact to involuntary manslaughter in connection with Officer Gibson's killing.  Claiborne also filed with this Court a petition for a writ of actual innocence to challenge his misdemeanor conviction. *See Claiborne v. Commonwealth*, No. 0360-21-2 (Va. Ct. App. June 21, 2022) (this day decided).

that was open over the t-shirt. Claiborne told Wooden that they did not need to go to Petersburg because Claiborne knew somewhere else to buy drugs. The three then went to the Waverly Village Apartments.

When they arrived at the Waverly Village Apartments, Wooden testified that Richardson and Claiborne went around the back of the apartments, leaving Wooden as a lookout. Wooden was told "to make a holler or something if I see somebody come." He testified that he lost sight of Richardson and Claiborne when they turned the corner behind the apartments. Within minutes, a Waverly police car pulled up and stopped. Wooden saw an officer exit the vehicle and walk toward the woods. Wooden made an audible signal to warn Richardson and Claiborne. At that point, Wooden said that he fled. As he was fleeing the apartment complex, Wooden heard a single gunshot.

Wooden testified that he first went to his grandmother's home but returned to his home after he found no one at his grandmother's residence. Richardson arrived back at Wooden's home shortly thereafter. According to Wooden, when Richardson "came into the house he looked nervous." Wooden "asked him then did they get the stuff," and Richardson replied, "No."

While they were at Wooden's home, Wooden received a phone call from a woman who was looking for one of Wooden's friends. The caller said that a police officer had been shot, and Wooden's friend asked the caller which police officer had been shot. Richardson could not hear the telephone conversation, but when Wooden's friend asked the caller which police officer had been shot, Richardson "said it was a new cop." Wooden testified that he did not know how Richardson would have known whether the injured officer was a new cop or not because "nobody, you know, know who was shot, so how would he [Richardson] know." Wooden was asked what happened after Richardson made this comment, and he testified, "We went out on the front deck in the front of my trailer and we stood there and talked. And then he just said it was a accident. . . . That he accidentally shot the cop, and if I tell anybody, something will be done to me and my family."

On cross-examination, Wooden admitted that he initially told investigators that he did not know anything about the shooting, that Richardson had stayed at his house the night before the shooting, and that

-3-

neither of them awoke until noon the next day (after the shooting had occurred). Wooden testified under oath that this initial statement was a lie. He acknowledged that he had also told police to investigate Leonard Newby as a suspect in the shooting. He said that he mentioned Newby to the police because "that's the only person I could think about other than Terence [Richardson] that had dreads. Or plaits in their head."

Following the preliminary hearing, a grand jury indicted Richardson for capital murder. However, Richardson and the Commonwealth subsequently reached a plea agreement. As part of the plea agreement, the Commonwealth amended the indictment and reduced the charge against Richardson from capital murder to involuntary manslaughter. Richardson then pled guilty to the reduced charge of involuntary manslaughter. The circuit court held a hearing on Richardson's guilty plea on December 8, 1999. During that hearing, the circuit court conducted a thorough plea colloquy with Richardson, during which Richardson responded affirmatively to each of the circuit court's questions. For example, the circuit court judge asked whether Richardson had discussed with his attorney the decision to plead guilty to involuntary manslaughter, and Richardson confirmed that he had. The judge asked, "After that discussion, was it your decision that you plead guilty?" Richardson answered, "Yes." The judge then asked, "Are you entering that plea freely and voluntarily?" After Richardson answered, "Yes," the judge then added, "Because you are in fact guilty?" Richardson answered, "Yes."

The attorney for the Commonwealth then presented the evidence that the Commonwealth would have introduced at trial. The Commonwealth first proffered testimony from Wooden consistent with his testimony at the preliminary hearing. The prosecutor stated that the Commonwealth would have also called Wooden's girlfriend to corroborate his testimony. Trooper Williams also would have testified at trial, and the Commonwealth would have called Corporal Aldridge to the stand to testify and to corroborate the testimony of Trooper Williams. Finally, the Commonwealth introduced the full transcript of the preliminary hearing, including the full testimony of Wooden and Trooper Williams. Richardson did not object to any of the proffers made by the Commonwealth. He did not object to any of the exhibits that the Commonwealth introduced. The trial court accepted Richardson's guilty plea and convicted him of involuntary manslaughter.

Following a sentencing hearing, the trial court sentenced Richardson on March 8, 2000, to a term of ten years of incarceration with five years suspended.

In December 2000, a federal grand jury indicted Richardson for (1) conspiracy to distribute a controlled substance, in violation of 21 U.S.C. § 846; (2) using a firearm to commit murder in the course of drug trafficking, in violation of 18 U.S.C. § 924(c) and (j); and (3) murder of a law enforcement officer in the course of drug trafficking, in violation of 21 U.S.C. § 848(e)(1)(B). Following a trial in the United States District Court for the Eastern District of Virginia, a jury convicted Richardson of the drug trafficking conspiracy but acquitted him of the other two charges.

At the federal sentencing hearing, the United States argued that Richardson's guilty plea to involuntary manslaughter in state court amounted to an admission that he was involved in Officer Gibson's death. Consequently, the United States Attorney urged the federal court to apply the sentencing enhancement provided by the United States Sentencing Guidelines for an intentional killing perpetrated in furtherance of a felony drug trafficking offense. The court agreed, finding that Richardson's guilty plea constituted an admission of participation in Officer Gibson's killing and that the record established "by clear and convincing evidence that this killing of another was with malice aforethought." Therefore, the court found that Richardson killed Officer Gibson "under circumstances that would constitute murder," and, consequently, the court applied the requested sentencing enhancement "by virtue of the ruling in *United States v. Watts* and its progeny."[3] As a result, Richardson's maximum sentence increased to life imprisonment, which the federal district court imposed.

Richardson appealed to the United States Court of Appeals for the Fourth Circuit, which affirmed the federal district court's ruling. The Fourth Circuit noted that the federal trial court had based its decision on Officer Gibson's "reasonably accurate description of the Appellants as his assailants, the corroborating

---

[3] In *United States v. Watts*, 519 U.S. 148, 157 (1997), the Supreme Court of the United States held that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence."

testimony of Wooden and another eyewitness, Appellants' guilty pleas in state court, and their false alibis." *United States v. Richardson*, 51 F. App'x 90, 94-95 (4th Cir. 2002). The Fourth Circuit concluded, "These facts amply support the finding that Appellants murdered Gibson." *Id.* The Supreme Court of the United States denied Richardson's petition for a writ of certiorari. 537 U.S. 1240 (2003). Richardson's post-conviction habeas proceedings in federal court were unsuccessful. 388 F.Supp. 2d 676 (E.D. Va. 2005). He later submitted a request for executive clemency to President Barack Obama, but his request for executive clemency was not granted.

PETITION FOR A WRIT OF ACTUAL INNOCENCE

In April 2021, Richardson filed the petition now before us. Richardson's claim of innocence centers on three pieces of evidence: (1) a "handwritten statement of an eyewitness, Miss Shannequia Gay ('Miss Gay'), who identified the perpetrator as man with dreads wearing a white t-shirt"; (2) a "photo array identification procedure conducted by state investigators with Miss Gay identifying a man named Leonard Newby as the 'man with dreads'"[4]; and (3) a "911 call to the Sussex County hotline identifying Leonard Newby as the perpetrator."

First, Richardson states that Shannequia Gay, a nine-year-old child who lived in the Waverly Village Apartments, saw the perpetrator flee the scene and made a statement to investigators that she saw a "man with dreads" running away from the scene. In contrast, Richardson states, "I wore my hair in cornrows at the time." Richardson maintains that he did not know about Shannequia Gay's statement to investigators before he pled guilty and states that he "became aware of the existence of the [Shannequia] Gay Statement in 2018."

Second, Richardson alleges that Shannequia Gay identified Leonard Newby as "the 'man with dreads'" when the police showed Shannequia an array of photographs later on the day of Officer Gibson's

---

[4] The petition for a writ of actual innocence in this matter contains no actual support for the assertion that the silhouette of a head and upper torso under which Shannequia Gay's name appears in fact actually depicts Leonard Newby or indeed who it even is. The individual's face is simply not visible, nor are the faces visible of any of the other eleven people in the photo array submitted to this Court with the petition. It is impossible to tell who the individual is, given that all one can see is a silhouette of a head and upper torso in each photo.

killing. Richardson states in the petition, "In May 2020, I became aware of the photo identification procedure where Miss Gay identified Leonard Newby as the 'man with dreads.'"

Third, Richardson relies on a "911 call to the Sussex County hotline identifying Leonard Newby as the perpetrator" in which a caller apparently reported that Leonard Newby was involved in Officer Gibson's killing. Richardson states in the petition, "In November 2020, I became aware of the 911 call identifying Leonard Newby as the perpetrator ('911 Tip')."

In addition to presenting these three pieces of evidence, Richardson also argues, "Petitioner was subject to a federal investigation and prosecution for the same exact offense and was acquitted of the crime of murder" even without the evidence he relies on in the petition. He asserts that his subsequent acquittal of murder in federal court establishes that no rational trier of fact would have found him guilty of involuntary manslaughter if presented with the evidence he relies upon in the petition now before us.

Consequently, Richardson argues, "The evidence upon which I based my claim is material and, when considered with all of the other evidence in the record, will prove that no rational trier of fact would have found me guilty or delinquent beyond a reasonable doubt of the charge(s) described above because had the evidence been available, my counsel would have never advised me to take a guilty plea."

The Attorney General responded to the petition in accordance with Code § 19.2-327.11(C). The Commonwealth initially asserted that Richardson's acquittal of the federal murder charges "is sufficient and dispositive in this matter" and argued that this Court should grant Richardson's petition or, alternatively, order an evidentiary hearing. The Commonwealth subsequently requested leave to file a supplemental brief and supplemental exhibits. In its filings, the Commonwealth explained that it "no longer adheres to certain arguments contained in its previously filed brief" and averred that certain "material information should have been part of the evidence submitted to this Court" as part of the Attorney General's response to the petition on behalf of the Commonwealth.

On February 28, 2022, the Commonwealth submitted supplemental exhibits together with a brief in opposition to the petition. In relevant part, the Commonwealth submitted to this Court a copy of a subpoena

-7-

for Shannequia Gay to testify before the Circuit Court of Sussex County at Richardson's trial. In addition, the Commonwealth also submitted the proof of service, which indicates the subpoena was executed on November 12, 1999, and returned to the Clerk's Office of the Circuit Court of Sussex County on November 19, 1999. Based in part on this subpoena and proof of service, the Commonwealth now contends that Shannequia Gay's statement and her alleged identification of another suspect in the photo array do not qualify as newly discovered evidence and therefore do not support a writ of actual innocence.

Richardson filed a reply to the Commonwealth's response on March 28, 2022. Richardson submitted supplemental exhibits as part of his reply, including additional documentary evidence and records from the federal court proceedings. In his reply, he also asks the Court "to strike the Commonwealth's Supplemental Brief" and confine the Commonwealth to the position that Richardson should be granted a writ of actual innocence.[5] Richardson maintains that "he has provided this Court with sufficient evidence to issue a writ of actual innocence." Consequently, Richardson asks this Court to grant his petition, or, "[a]lternatively, should the Court believe further factual development is necessary, Mr. Richardson requests that his case be remanded to the Circuit Court for an evidentiary hearing" pursuant to Code § 19.2-327.12.

---

[5] The statutory framework governing actual innocence cases requires the Office of the Attorney General to "file a response to the petition" on behalf of the Commonwealth when directed to do so by this Court. *See* Code § 19.2-327.11(C). As part of the Attorney General's statutory authority, "[t]he response may contain a proffer of any evidence pertaining to the guilt or delinquency or innocence of the petitioner that is not included in the record of the case." Code § 19.2-327.11(C). Consistent with this statutory obligation, the Attorney General responded to the petition with a supplemental pleading that presented the Court with additional and material documentary evidence related to Richardson's petition. We do not agree with Richardson's argument that the Court must disregard the supplemental exhibits and supplemental pleadings that were submitted to the Court for our consideration in this matter.

Furthermore, when the Commonwealth moved for leave to file a supplemental pleading, this Court, sitting in its original jurisdiction, had not yet even heard oral argument on the petition, given the numerous extensions requested by the Attorney General in this matter – all of which Richardson did not oppose, except for the last one. The Court afforded Richardson an opportunity to file a reply to the Commonwealth's supplemental pleadings. He did so. The Commonwealth's supplemental pleadings and Richardson's reply are all part of the record now before us.

ANALYSIS

"Code § 19.2-327.10 confers original jurisdiction upon this Court to consider a petition for a writ of actual innocence based on non-biological evidence." *Parson v. Commonwealth*, 74 Va. App. 428, 440 (2022) (quoting *Johnson v. Commonwealth*, 72 Va. App. 587, 596 (2020)). "Chapter 19.3 of Title 19.2 of the Code of Virginia provides both the authority and the statutory boundaries given by the General Assembly" for issuing a writ of actual innocence based on nonbiological evidence. *Waller v. Commonwealth*, 70 Va. App. 772, 775 (2019).

In order to obtain a writ of actual innocence, the petitioner must "prove[] by a preponderance of the evidence all of the allegations contained in clauses (iv) through (viii) of subsection A of § 19.2-327.11[.]" Code § 19.2-327.13. Consequently, the statute requires the petitioner to prove: *first,* that the evidence relied upon in the petition "was previously unknown or unavailable to the petitioner or his trial attorney of record at the time the conviction or adjudication of delinquency became final in the circuit court," Code § 19.2-327.11(A)(iv)(a); *second*, "that the previously unknown or unavailable evidence is such as could not, by the exercise of diligence, have been discovered or obtained before the expiration of 21 days following entry of the final order of conviction or adjudication of delinquency by the circuit court," Code § 19.2-327.11(A)(vi)(a); *third*, "that the previously unknown, unavailable, or untested evidence is material and, when considered with all of the other evidence in the current record, will prove that no rational trier of fact would have found proof of guilt or delinquency beyond a reasonable doubt," Code § 19.2-327.11(A)(vii); and *fourth*, "that the previously unknown, unavailable, or untested evidence is not merely cumulative, corroborative, or collateral," Code § 19.2-327.11(A)(viii).

The petitioner must establish the existence of each of these conditions "by a preponderance of the evidence." Code § 19.2-327.13. "[T]he preponderance standard is satisfied when the evidence convinces a factfinder that a particular fact in dispute was 'more probable than not.'" *Tyler v. Commonwealth*, 73 Va. App. 445, 461 (2021) (quoting *Lysable Transp., Inc. v. Patton*, 57 Va. App. 408, 419 (2010)). Because the General Assembly has empowered this Court to issue writs of actual innocence "*only* upon a finding that

-9-

the petitioner has proven by a preponderance of the evidence *all* of the allegations contained in clauses (iv) through (viii) of subsection A of § 19.2-327.11," a petitioner's failure to establish any one of the statutory requirements compels us to dismiss the petition. Code § 19.2-327.13 (emphasis added); s*ee Tyler*, 73 Va. App. at 463 ("[A] failure of Tyler to establish any one of the required facts requires us to dismiss his petition.").

Furthermore, the actual innocence statute directs us to consider the petition in conjunction with "all of the other evidence in the current record," Code § 19.2-327.11(A)(vii), and with "the record of any trial or appellate court action" in the underlying case, Code § 19.2-327.11(D). Therefore, the statute compels us to consider the evidence proffered by the Commonwealth at the hearing on the entry of Richardson's guilty plea. *See id*. While Richardson's guilty plea does not bar his claim of innocence, his "sworn admission of guilt remains 'one of many factors'" that we must consider in analyzing whether he has met the heavy burden under the statute of proving that no rational trier of fact would have found him guilty. *Parson*, 74 Va. App. at 444 n.7 (citing *In re Watford*, 295 Va. 114, 126 (2018)); *see* Code § 19.2-327.11(A)(vii) and Code § 19.2-327.13.

In conducting our analysis of the petition, "[w]e assess the evidence and proffers individually under Code § 19.2-327.11(A)" to determine whether Richardson has established each of the statutory requirements by a preponderance of the evidence. *Knight v. Commonwealth*, 71 Va. App. 492, 509 (2020); *see also* Code § 19.2-327.13.

### 1. Shannequia Gay's Statement to Investigators

In order to qualify for a writ of actual innocence, the petitioner must prove that the evidence he relies upon "is such as could not, by the exercise of diligence, have been discovered or obtained before the expiration of 21 days following entry of the final order of conviction[.]" Code § 19.2-327.11(A)(vi)(a).

Richardson states in his petition, "I became aware of the existence of the [Shannequia] Gay Statement in 2018[.]" He also states, "The evidence could not have been discovered or obtained by the exercise of diligence before the expiration of 21 days following entry of the final order of conviction."

-10-

"[D]iligence," in the context of Code § 19.2-327.11(A)(vi)(a), means "a 'devoted and painstaking application to accomplish an undertaking.'" *Tyler*, 73 Va. App. at 464 (quoting *Madison v. Commonwealth*, 71 Va. App. 678, 702 n.14 (2020)); *see also Dennis v. Jones*, 240 Va. 12, 19 (1990) ("The noun 'diligence' means 'devoted and painstaking application to accomplish an undertaking.'" (quoting *Webster's Third New International Dictionary* 633 (1981))). For example, in *Tyler*, this Court concluded that the petitioner's failure to subpoena a known witness amounted to "far less than a 'devoted and painstaking application to' have his version of events heard at trial" and therefore concluded that the petitioner failed to meet his burden required under Code § 19.2-327.11(A)(vi)(a) for a writ of actual innocence. *See* 73 Va. App. at 465. Similarly, in *Madison*, 71 Va. App. at 702 n.14, this Court concluded that a petitioner's failure to demonstrate that he "exercised any diligence in trying to locate and speak to [a witness] at any time prior to trial" or even within "21 days following the entry of the final conviction order" meant that the petitioner had failed to prove that he exercised the diligence required by Code § 19.2-327.11(A)(vi)(a).

In this case, the record shows that Shannequia Gay had been subpoenaed to testify on behalf of the Commonwealth at Richardson's trial before Richardson ever entered a guilty plea to involuntary manslaughter. The subpoena from the Commonwealth directed Shannequia Gay to testify and listed her address as the "Waverly Village Apts." The proof of service indicates the subpoena was executed on November 12, 1999. The proof of service also states, "Shannequia Gay is a juvenile served on father[.]" The proof of service was signed, date-stamped, and filed in the Clerk's Office of the Circuit Court of Sussex County on November 19, 1999. The hearing at which Richardson pled guilty did not occur until December 8, 1999. Furthermore, the circuit court did not enter a sentencing order in Richardson's case until March 8, 2000, meaning that Richardson's conviction did not actually become final until the expiration of twenty-one days after March 8, 2000. Therefore, the record shows that Richardson and his trial counsel had ample time to investigate the subpoena, to talk to Shannequia about what she saw, or to work with her parents to do so— all before Richardson's conviction became final.

-11-

Given that the subpoena and proof of service were on file in the Clerk's office of the trial court, Richardson and his trial counsel simply needed to look in the Clerk's office file of this case to discover that subpoena and proof of service. If they had done so, they would have seen that the Commonwealth intended to put a juvenile who lived in the Waverly Village Apartments on the witness stand at Richardson's trial.[6]

Furthermore, if they had been previously unaware of what Shannequia saw that would be relevant to Richardson's guilt or innocence, the discovery that the Commonwealth intended to call her as a witness certainly would have prompted a person of reasonable diligence to ascertain any relevant information Shannequia Gay possessed, including any statements she made about what she saw.

In addition, Richardson's trial counsel David Boone reportedly recalled Shannequia Gay's name during his September 2021 interview with the Office of the Attorney General "and stated that he was aware of her prior to the plea agreement." Boone said that the private investigator he hired had "attempted to speak with [Shannequia] Gay, but she was never made available." Boone also said that Commonwealth's Attorney J. David Chappell "may have provided him with the name along with a summary of who she [Shannequia Gay] was and what she said." At oral argument before this Court, counsel for Richardson maintained that Shannequia Gay "was only known by name only" and that although a subpoena had been issued for her to testify, "the only people who knew what Miss Gay was going to say were the authorities." However, even accepting counsel's assertion at oral argument before this Court that Richardson and his trial counsel were unaware of what Shannequia Gay would have testified if the case had gone to trial, their unawareness of the

---

[6] In addition, J. David Chappell, the former Commonwealth's Attorney for Sussex County who prosecuted the case, stated in a sworn affidavit in December 2020 that his office "employed an 'open file' discovery policy in these cases," which allowed defense counsel to have free and open access to all of the Commonwealth's evidence. Chappell also stated that he conducted "at least one major discovery conference" with Richardson's trial counsel—prior to the hearing at which Richardson pled guilty—in order to "ensure that defense counsel had access to all the collective Commonwealth's evidence."

In a September 2021 interview with the Office of the Attorney General as it investigated this matter, Richardson's trial counsel, David Boone, stated that he did not think that he and Chappell had an open file agreement but was adamant that Chappell would not have withheld any information related to the case. Boone recalled having several meetings with Chappell prior to Richardson's guilty plea.

anticipated trial testimony of a child witness who lived next to the scene of the crime simply shows "far less than a 'devoted and painstaking application to'" the task of proving Richardson's innocence while this matter was before the trial court. *See Tyler*, 73 Va. App. at 465; *Madison*, 71 Va. App. at 702 n.14; *see also* Code § 19.2-327.11(A)(vi)(a).

In short, Shannequia Gay had been subpoenaed as a witness for the Commonwealth weeks before the hearing at which Richardson pled guilty—and literally months before his conviction became final (and was still under the control of the trial court). Under these circumstances, we find that Richardson has not proven by a preponderance of the evidence that Shannequia Gay's statement "is such as could not, by the exercise of diligence, have been discovered or obtained before the expiration of 21 days following entry of the final order of conviction or adjudication of delinquency by the circuit court." Code § 19.2-327.11(A)(vi)(a). Therefore, Richardson has not shown "a 'devoted and painstaking application to'" obtain the evidence from Shannequia Gay that he relies upon in the petition. *Tyler*, 73 Va. App. at 465; *Madison*, 71 Va. App. at 702 n.14. Consequently, we conclude that Shannequia Gay's statement fails to satisfy Code § 19.2-327.11(A)(vi)(a)— one of the basic threshold statutory requirements for the issuance of a writ of actual innocence.

2. The Photo Array

Richardson states in the petition, "In May 2020, I became aware of the photo identification procedure where Miss Gay identified Leonard Newby as the 'man with dreads.'" The photo array provided to this Court with Richardson's petition, as noted above, shows the silhouettes of apparently twelve people's heads and upper torsos, although their faces are not visible.

As we have explained *supra*, the actual innocence statute requires the petitioner to prove, by a preponderance of the evidence, "that the previously unknown or unavailable evidence is such as could not, by the exercise of diligence, have been discovered or obtained before the expiration of 21 days following entry of the final order of conviction." Code § 19.2-327.11(A)(vi)(a); *see* Code § 19.2-327.13.

At oral argument before this Court, counsel for Richardson argued that the photo array "is evidence that is separate and apart from" Shannequia's statement and that it could not have been discovered with the

exercise of diligence "even if they did get in contact with Miss Gay" before Richardson's conviction became final. Counsel was then asked, "[I]f in fact trial counsel had consulted with Miss Gay, as relates to what her anticipated testimony would have been at trial, would not it have been also due diligence for him to inquire whether or not she had made any identification?" Counsel for Richardson answered, "That is true, Your Honor, that is absolutely true." Nonetheless, counsel maintained that neither Richardson nor his trial counsel actually knew about the photo array.

Because we have concluded that the exercise of diligence would have revealed Shannequia Gay's role as a witness in this case, we similarly conclude that the exercise of diligence for purposes of Code § 19.2-327.11(A)(vi)(a) would have revealed the purported photo identification of a possible alternate suspect made by the very same witness later in the day of Officer Gibson's killing. A devoted and painstaking application to securing evidence from a witness who had already been subpoenaed to testify at trial would have involved inquiring about any prior identifications that the witness had made based on what she saw—as counsel candidly acknowledged at oral argument. Consequently, even if we accept Richardson's contention that he did not actually know about the photo array before his conviction became final, he has not met the statutory requirement of proving that the photo array "could not, by the exercise of diligence, have been discovered or obtained before the expiration of 21 days following entry of the final order of conviction." Code § 19.2-327.11(A)(vi)(a). Because Richardson has failed to prove that the photo array "could not, by the exercise of diligence, have been discovered" before his conviction became final, the photo array fails to satisfy one of the necessary statutory preconditions to the issuance of a writ of actual innocence. Code § 19.2-327.11(A)(vi)(a).

### 3. The Anonymous 911 Tip

Richardson also relies on "a message on the State police answering machine on April 30, 1998 with a tip that identified 'Leonard Newby' as a person involved, that Leonard had dreads, and that Leonard Newby had since cut his dreads." The 911 message was transcribed by an unidentified individual on April 30, 1998, and states, "A male caller called in and stated Leonard Newby was involved and has cut his dreds."

-14-

In part, Code § 19.2-327.11(A)(vii) requires the petitioner to prove "that the previously unknown, unavailable, or untested evidence is material[.]" The Supreme Court of Virginia has held, "[T]o be 'material,' within the meaning of Code § 19.2-327.11(A)(vii), evidence supporting a petition for a writ of actual innocence based on non-biological evidence must be true." *Carpitcher v. Commonwealth*, 273 Va. 335, 345 (2007). "Manifestly, evidence that is false cannot be 'material' under the terms of the statute." *Id.*

In this case, Richardson has provided no information concerning the origin of the 911 message, the identity of the caller, or the identity of the person who transcribed it. The content of the message itself gives no indication of the foundation of the caller's knowledge. Thus, Richardson has presented the Court with an unidentified individual's transcription of an anonymous message from an unknown caller, the credibility of whom is impossible to verify or even begin to know. Consequently, Richardson has failed to show by a preponderance of the evidence that the 911 message is "material" within the meaning of Code § 19.2-327.11(A)(vii), because he has not shown that the content of the message is true. *See Carpitcher*, 273 Va. at 345. Therefore, the 911 message fails to satisfy the requirements of the actual innocence statute. *See* Code § 19.2-327.11(A)(vii).

### 4. The Federal Jury Verdict

Finally, Richardson also argues that "a federal jury trial found the Petitioner innocent of the murder." He contends that "[t]he import of the federal acquittal is not that it is new evidence of innocence, . . . but that it allows Mr. Richardson to meet his statutory burden to assure this Court that a rational trier of fact would not convict." In response, the Commonwealth argues, "Neither of the crimes of which Petitioner was acquitted in federal court were the legal or factual equivalent to involuntary manslaughter under Virginia law."

The actual innocence statute requires the petitioner to prove that "*no* rational trier of fact would have found proof of guilt or delinquency beyond a reasonable doubt." Code § 19.2-327.11(A)(vii) (emphasis added). Applying the plain language of the statute, "it is not enough for [Richardson] to convince us that some, many, or even most rational factfinders would have acquitted him." *Tyler*, 73 Va. App. at 469.

-15-

Instead, "[h]e must prove that *every* rational factfinder would have done so." *Id*. Consequently, one factfinder's verdict is plainly insufficient to carry a petitioner's burden under Virginia's actual innocence statute.

In addition, Richardson's acquittal of murder in federal court represents one factfinder's verdict *on an entirely different crime*. In federal court, Richardson was charged in part with violating 21 U.S.C. § 848(e)(1)(B) and 18 U.S.C. § 924(j)(1). The charge under 21 U.S.C. § 848(e)(1)(B) provided for a term of "up to life imprisonment" for any person who, "during the commission of, in furtherance of, or while attempting to avoid apprehension, prosecution or service of a prison sentence for, a felony" drug trafficking offense, "**intentionally** kills or counsels, commands, induces, procures, or causes the **intentional** killing" of any "law enforcement officer engaged in, or on account of, the performance of such officer's official duties[.]" (Emphasis added). The charge under 18 U.S.C. § 924(j)(1) required proof of the use of a firearm to perpetrate an unlawful killing "**with malice aforethought**." *See* 18 U.S.C. § 924(j)(1) (citing 18 U.S.C. § 1111).

In contrast, Richardson pled guilty to involuntary manslaughter in state court. His conviction of involuntary manslaughter is the conviction he seeks to vacate in this matter. Under Virginia law, "[i]nvoluntary manslaughter is defined 'as the **accidental** killing of a person, **contrary to the intention of the parties**, during the prosecution of an unlawful, but not felonious, act, or during the improper performance of some lawful act.'" *Kelly v. Commonwealth*, 42 Va. App. 347, 355 (2004) (quoting *Gooden v. Commonwealth*, 226 Va. 565, 571 (1984)). Therefore, the federal charges clearly required proof of a different intent than the state involuntary manslaughter charge. Thus, the elements of the crimes are markedly different. The federal jury's verdict that Richardson was not guilty of an intentional killing or a killing with malice aforethought simply does not prove that Richardson is actually innocent of the *accidental* killing to which he pled guilty in the Circuit Court of Sussex County. Consequently, Richardson's federal acquittals fail to establish that "no rational trier of fact" would have found him guilty of involuntary manslaughter as required by Code § 19.2-327.11(A)(vii). Because Richardson has not proven by a

-16-

preponderance of the evidence "that the previously unknown, unavailable, or untested evidence is material and, when considered with all of the other evidence in the current record, will prove that *no* rational trier of fact would have found proof of guilt or delinquency beyond a reasonable doubt," he has not satisfied what the statute requires for issuing a writ of actual innocence. Code §§ 19.2-327.11(A)(vii) (emphasis added); 19.2-327.13.

CONCLUSION

In short, for all of the foregoing reasons, Richardson has simply not established that he has satisfied each of the requirements of Code § 19.2-327.11(A)—the statute that must be satisfied in order to grant a petition for a writ of actual innocence. Applying the plain language of Code § 19.2-327.11(A), we conclude that Richardson is simply ineligible for a writ of actual innocence and, therefore, hold that his petition must be dismissed. Code § 19.2-327.11(A). We direct the Clerk of this Court to deliver on this date this order to the Circuit Court of Sussex County, and send copies of this order to petitioner's counsel, to the Attorney General, and to the Commonwealth's Attorney for Sussex County.

This order shall be published.

A Copy,

Teste:

A. John Vollino, Clerk

By: *original order signed by a deputy clerk of the Court of Appeals of Virginia at the direction of the Court*

Deputy Clerk

-17-